Johnson, Chief Judge.
I. As to the competency of ■Charles Hoyt as a witness.
Counsel for Mrs. Hoyt erroneously assume that section ■313 of the code, as amended May 2, 1871 (68 Ohio L. 127), was in force at the date of this trial, April 17, 1874. 'That section was again amended April 13, 1874 (71 Ohio L. 68), and the section as thus amended was in force at the ■time of the last trial, April 17,1874, and governed the case. By this last amendment, the words, “ or is a party claiming •or defending as heir, grantee, or devisee of a deceased per.son,” which were in the act of May 2, 1871, are omitted. If it be conceded that, under the act of 1871, the widow was “ a party claiming as an heir,” and therefore, under that act, Charles Hoyt wras an incompetent witness, yet, as that act was repealed April 13, 1874, four days before the •trial, and the act of the latter date, in which these words were omitted, -was in force, the objection is not well taken.
II. Was Samuel Hoyt seized of this land after his marriage, January 17, 1864, to the petitioner, notwithstanding his conveyance to his son, Charles, October 10, 1863 ? It Is not claimed that this conveyance was made in contemplation of marriage, and in fraud of the rights of the petitioner, who soon after became the wife of the grantor. Neither is it a proceeding in equity to set aside a convey *207 anee, on the ground that, as between the grantor and the grantee and their privies, it has been obtained by the fraudulent acts of the grantee.
1. The claim to dower is based on the alleged fact that this deed, though in fact executed on the day of its date, October 10, 1863, was not delivered to Charles until some four years after coverture, if at all, and, therefore, no title passed to Charles, until after the wife’s inchoate right of dower attached.
2. It is claimed that actual delivery of this deed occurred in 1868, about the time Charles conveyed to Black, and that there was no valid consideration to support it. On the contrary, it is claimed by Black:
First. That the deed to Charles was delivered at the time of its date, for a valuable consideration.
Second. That, even if not delivered in fact or in law, until lifter coverture, yet it was for a valuable consideration, and 'in execution of a contract existing' prior to said marriage, and the rule is invoked which holds the wife’s inchoate right of dower to be subject to an existing executory contract of sale.
In the view we take of this case, it is not necessary to ■state at length the evidence bearing upon the whole case. The proof is clear and uncontroverted, that, prior to the ■death of the first wife, in August, 1863, Samuel Hoyt had verbally agreed to give Charles the farm, if he would take ■care of his parents, during their lives, and pay his brothers .and sisters certain legacies. Whether Charles had so far performed this verbal contract, as to take it out of the statute of frauds — a point largely relied on — becomes immaterial, in view of the undisputed fact that, shortly after his wife’s death, and prior to his second marriage, Samuel Hoyt, in execution of his purpose and verbal agreement, conveyed the land to Charles, if this deed of October 10, 1863, was actually delivered prior to the second marriage.
On the 10th of October, 1863, Samuel Hoyt, in view of his verbal contract or promise to Charles, and of an intended visit to friends in the east, from which, as he said, *208 he might not return, executed the following paper writing,, and left the same with John Yentzer, a neighbor:
“ Know all men by these presents, That I, Samuel Hoyt,, of Rig Spring township, Seneca county, Ohio, do this day divide my property to my six children, as follows, to wit: To Zina Hoyt, Harrison Hoyt, and Samuel Hoyt, and my two daughters, Mary and Sarah Jane, each $1,000; and' Charles Hoyt, my youngest son, I give my farm where I live on, in Big Spring township, Seneca county, Ohio, near-Adrian, containing one hundred acres, more or less, on these conditions, as follows: By paying each of the five-first named fifty dollars yearly, till each of the five has-$1,000, with that they already got of me; and also maintain me as long as I live, and, at my death, have a sermon preached, and get a tombstone, and pay all the expenses; and I will give Charles Hoyt the deed forthwith for the farm.
“ In testimony whereof, I have set my hand and seal this • 10th day of October, 1863. Charles Hoyt, [seal.]
“"Witness present, John Yentzer.”
Yentzer’s explanation of this paper is as follows :
“ Was well acquainted with Samuel Hoyt, deceased; had a conversation with said Samuel Hoyt a few weeks before-his first wife died. Samuel Hoyt and his first wife, Charles’ mother, came over to my house, and Mr. Hoyt said he wanted mo to transact some business for him; that he wanted to make a will; that he had agreed with Charles,, when he came of age, that if he would stay at home and. keep them, and pay the other heirs $1,000, with what they-had got already, that they would let him have the farm.. Said they were to give Charles a deed for the farm; that they then wanted me to write a deed for the farm to Charles,. but I told them I was not a ’squire any more, giving the farm to Charles on the same terms- spoken of.
“ I wrote a will for him. Mrs. Hoyt was taken sick, and. they could not finish all the papers, and she went home and' died from that sickness in about two weeks. They were-both anxious to- give a deed to Charles for the farm.
*209 “ On the 10th day of October, 1863, Mr. Hoyt came to my house again; his wife was then dead; said he was then going away to York State, and wanted me to draw up some papers for him; said again that he had agreed with Charles that, if he would stay at home, take care of him and his wife, and pay the other children $1,000, with what they already had, that he would give him a deed for the farm; and asked me to put that in writing, and that he would sign it; that ho would give a deed to Charles for the farm right away, and wanted me to make out the deed then. I told him that he had better go to ’Squire Brayton’s for that, as I was not a ’squire, and could not acknowledge it. I wrote this paper; dated October 10, 1863, and Samuel IToyt signed it.”
The witness then further testified: “ That said Samuel Hoyt then said that he owed his son, Charles Hoyt, $2,100, which he considered down money — on the farm. Samuel Hoyt then told me that he was going over to ’Squire Bray-ton’s, to have the deed- made out to Charles for the farm.”
After executing the foregoing paper, which was a declaration of his purpose as to his property, Samuel Hoyt went, on the same day, to ’Squire Brayton, and then executed and acknowledged this deed to his son, Charles, to carry out this purpose, and left it with Brayton, to be delivered to Charles. That he had the right to dispose of this land, in execution of the plan disclosed in the paper left with Bray-ton, no one will doubt. That he, on the same day he left this paper with Yentzer, duly executed and left with Bray-ton a deed in fee simple to Charles, is uncontroverted. It is admitted that Brayton did not in fact deliver the deed to Charles until 1868; but it is insisted that the delivery to Brayton was not as an escrow, or upon condition, but absolutely, and therefore immediately vested- the title in Charles Hoyt.
The priority of Charles Hoyt’s title over the widow’s inchoate right of dower, leaving out of view the second point in the case, depends on whether the delivery of the deed to ’Squire Brayton was absolute, so as to vest the title in *210 Charles. If so, the subsequent marriage of the grantor did not vest in his wife an inchoate right of dower in the land conveyed. As to the delivery of the deed, Brayton testifies that:
“ Samuel Hoyt, Sen., on the 10th day of October, 1863, came to me, and requested me to make out a deed for the land described in this deed to Charles Hoyt, his son. Stated he was going east, and, if anything happened, he wanted me to give it to Charles, or, if Charles called for it, for me to stamp it and give it to him. I made the deed, and took the acknowledgment; it remained in my possession until the 26th day of March, 1868. I, on that day, drew an article between Charles Hoyt and Jacob Black, for the sale of the land to Black, and, on that day, I delivered the deed by laying it down on the table in the presence of Charles Hoyt, Jacob Black, and Samuel Hoyt, Sen. I have no distinct recollection about who picked it up or took it áway. I stamped it that day, by Samuel Hoyt’s request, and dated the canceling of the stamps back to the date of the deed. Charles Hoyt furnished the stamps.”
On cross-examination he says:
“ Q. At the time that Mr. Samuel Hoyt came to you to have you draft the deed, what did he say about the reason for making deed to Charles, and what kind of a deed he wanted to be made ?
uAns. He said he was going east to York State, and he wanted Charles to have that land. He wanted a warranty deed, and was very particular to have it made right. He spoke about this more than once. He said he had been to Yentzer’s and made an article or a will, finally settled down and called it an article.
“ Q. Atwhat time in the transaction of that business was it that he spoke about the delivery of the deed to Charles?
“Ans. After the deed had been finished, signed, and acknowledged, he said, if any thing happens, or Charles calls for this deed, stamp it and give it to Charles.
“ Q. Did he name any condition to you upon which the deed was to be delivered to Charles?
*211 “Ans. Nothing further than I have stated.
“ Q. Did Mr. Samuel Hoyt ever say any thing further to ■you about the delivery of the deed to Charles, after the time of its execution, and prior to the time that the contract was made with Mr. Black for the purchase of the land.
“Ans. Nothing whatever, that I have any recollection of.”
Charles unexpectedly returned from the army, on the 11th of October, the next day after the execution of this deed, and he testifies, that on that day, his father told him what he had done, that he had made the deed and left it with Brayton for him, and that he should go and get it.
Yentzer testifies, that he saw Samuel Hoyt on the same day he executed this testamentary declaration, and the deed, on his return from Brayton’s, and he “ said he had been over to ’Squire Brayton’s; had made the deed for the farm to Charles, and left it with ’Squire Brayton for him, and told me to tell Charles that he had made the deed for the farm to him and left it at Brayton’s, and that I should tell Charles .to go and get it. Charles was then in the army. And he then said that if any thing should happen to him, aud he should die, that I should show that paper to his children ; as to how he had divided his property; said he was afraid one of his sons would make trouble.
“ I saw Charles in the fall of 1863, before the marriage of Mr. Hoyt to the petitioner; told him what his father told me, as I have before stated. Charles said his father had told him all about it; that he was satisfied, and that the deed was as safe at Brayton’s as at his house; he was satisfied.”
Other declarations of the grantor to the same purport were in proof, but as there is no conflicting testimony as to the character of this delivery, it need not be cited. Upon these facts it is clear, that the delivery of the deed by the grantor to ’Squire Brayton, was absolute in its character, and that the knowledge of such delivery was brought home t; the grantee the next day, when he accepted the terms proposed by his father. This operated to vest the legal *212 title in Charles, on the 10th day of October, 1863, three months before the marriage of the grantor to the petitioner. Mitchell v. Ryan, 3 Ohio St. 377; Shirley v. Ayers, 14 Ohio, 307; Steele v. Loury, 4 Ohio, 72; Hummel v. Hummel, 19 Ohio, 17; Hoffman v. Machall, 5 Ohio St. 124.
Whether, had this verbal contract of 1855, between the father and son, remained executory, or had the testamentary purpose, declared in the paper with Yentzer, not been fully executed by the father, a court of equity would, as against the claim for dower, have specifically enforced either, we need not inquire.
The uncontra<Jicted testimony is, that in pursuance of a contract or purpose long pre-existing, and without any intention to defraud his future wife, the grantor fully executed his -intention to deed the farm to Charles. He lived nine years afterward, and always recognized the ownership of Charles, was present at the sale and conveyance by him to Black, in 1868, and assisted in making the sale, and at no time complained that Charles had not fully performed the contract on his part. Even had Charles failed to perform, the failure would not have diverted the title, as the payment of these sums to the brothers and sisters, and the support of the father, after the deed was made, were all, obligations to' be performed subsequently, and their nonperformance would not operate to reinvest the title in the father.
Judgment of the district court and common pleas reversed, and cauBe remanded.